UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

**FILED**
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

SEP 2 3 2002

*Robert M march*
**CLERK**

ERNEST DAN AND ELSIE DAN, )
on their own behalf, and as parents )
and next friends of ERIC DAN, a minor, )
 )
       Plaintiffs, )
 )
       v. )
 )
UNITED STATES OF AMERICA; STAFF )
RELIEF, INC., MEDICAL STAFFING )
NETWORK, INC., XYZ CORPORATION, INC., )
and J.M. RUSSELL, R.N., )
 )
       Defendants. )
 )

Civil No. 01-25 MCA/LFG-ACE

## DEFENDANT UNITED STATES' PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to the Court's Pre-Trial Order, filed August 2, 2002, and the Court's Preparation

for Civil Trial instructions, the Defendant United States of America, by and through the

undersigned counsel, hereby submits its proposed Findings of Fact and Conclusions of Law. A

WordPerfect diskette containing this pleading is also attached pursuant to the Court's trial

instructions.

### A. PROPOSED FINDINGS OF FACT

1.    This is a medical malpractice action against the United States of America brought by

    Plaintiffs Ernest and Elsie Dan on behalf of their minor son, Eric Dan. (Complaint

    ("Complt.") at ¶ 1.

2.    This action is brought pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§

    1346(b), 2671 et seq. Complt. at ¶ 2.

3.  The Northern Navajo Medical Center ("NNMC"), in Shiprock, New Mexico, is an entity of the Government of the United States of America. NNMC is operated by the United States through the Indian Health Service.

4.  The acts or omissions alleged on the part of the medical personnel at issue in this case all took place within the boundaries of the State of New Mexico.

5.  Plaintiffs Ernest and Elsie Dan are Eric Dan's natural parents. (Exh. N (Elsie Dan Deposition); O (Ernest Dan Deposition)).

6.  Eric Dan was born on September 18, 1993. (Exh. I (NNMC Medical Records) at NNMC 03).

7.  In July 1998, the Dan family lived at their current home in the Teec Nos Pos community within the Navajo Indian reservation. (Exh. N at 7-8).

8.  On Sunday, July 19, 1998, Eric started complaining about a "stomach ache." (Exh. N at 50.) Mrs. Dan told Eric to "[l]ay down on your tummy. It will probably go away." Eric followed his mother's instructions. (Exh. N at 50). He felt better and later decided to take a bath. (Exh. N at 51).

9.  On Monday, July 20, 1998, Eric began to complain again about his stomach. Mrs. Dan testified: "So all day and towards the evening, you know, he just said that again – he said, 'I got a stomachache[sic].'" (Exh. N at 51).

10. The Dans' truck was not in working condition. Mr. Dan worked on the truck the day before trying to repair it. (Exh. N. at 50). Because the truck was not working, Mrs. Dan told Eric: "If the truck was fixed right, we could get some medicine." (Exh. N at 51).

11. On Tuesday, July 21, 1998, Mr. Dan left for work and Mrs. Dan was doing dishes at

approximately 9:00 a.m. to 10:00 a.m. (Exh. N at 51). The Dan children were still sleeping since it was the summer.

12. Ernest, Jr., one of the Dan children, crawled into bed with Eric who was still sleeping. (Exh. N at 51-52). Ernest, Jr. noticed that Eric had vomited and reported this to his mother. (Exh. N at 51-52).

13. Mrs. Dan went into the room and noticed a "greenish color" substance. (Exh. N at 52)

14. Mrs. Dan pushed Eric onto the side of the bed, pulled up his shirt and felt his stomach. She described the stomach as feeling "hard." (Exh. N at 52). Eric was very quiet and not complaining. (Exh. N at 52).

15. Mrs. Dan then "chase[d] up [her] son, Ernie." (Exh. N at 52). She then "went out to the back and I saw the truck and the flat – the tire was flat." (Exh. N at 52). She found her son Ernie and asked him if he could change the tire so that they could take Eric to the hospital. (Exh. N at 52).

16. Mrs. Dan and her son, Ernie, tried unsuccessfully to unscrew the tire. (Exh. N at 52). Finally, Mrs. Dan woke up her daughter LaTanya and told her, "Go down to the girls, ask them – see if they are home, ask them if they can take us to the hospital." (Exh. N at 52).

17. LaTanya Dan ran to her grandmother's home about a quarter of a mile away from the Dan home. (Exh. N at 53). The Grandmother came to the Dan home and agreed that Mrs. Dan needed to take Eric to the hospital. She said: "I told the girls to hurry up, get ready." (Exh. N at 53). The girls are Olivia Dan and Cecilia Dan, Mrs. Dan's sisters-in-law. (Exh. N at 17).

18. Olivia Dan and Cecilia Dan arrived at the Dan home about 15 to 20 minutes later. (Exh.

N at 53). Mrs. Dan then "had to get ready, and we were all running around." (Exh. N at 53).

19.    They left the Dan home sometime thereafter for NNMC. Mrs. Dan described the drive as follows: "So we left, and from our house to the store, it's eight miles dirt road, and it gets bad. So we kind of have to go slow . . . When we got to the highway, we had to kind of blaze, slow down, you know, and we even turned the emergency lights on where we can pass people, you know." (Exh. N at 53).

20.    Mrs. Dan and Eric, along with family members, arrived at the NNMC emergency room at 12:05 p.m., nearly 2-3 hours from when she first became aware that Eric had vomited. (Exh. I at NNMC 01).

21.    In the emergency room, Mrs. Dan was asked about Eric and she gave a history of his complaints. (Exh. N at 53-55; Exh. I at NNMC 01).

22.    In the emergency room, Mrs. Dan reported that Eric had a sore belly since morning, no bowel movement since Sunday, incidents of burping and some belching since Sunday, a fever on Monday, and one incident of vomiting. (Exh. I at NNMC 01).

23.    Eric was examined by Dr. Laurie Lemauviel in the emergency room. Dr. Lemauviel found that Eric had an enlarged abdomen that was distended, tense, and firm. (Exh. I at NNMC 01).

24.    Dr. Lemauviel also found that Eric was alert, that he had diminished bowel sounds and no stool in vault, that he was pale and thin, that he groaned non-stop, that he had a dry oral pharynx, that his lips were sticking to his teeth, and that he had crepitant sounds in his abdomen on expiration. (Exh. I at NNMC 01).

25. Eric Dan had a Glasgow Coma Scale score of 15 in the emergency room. (Exh. I).

26. Eric Dan's vital signs in the emergency room were initially recorded to be Pulse: 147; Blood Pressure: 128/80; Temp. 102°. (Exh. I at NNMC 01). No respiration rate was recorded initially, but at 12:30 p.m. the respiration rate was recorded to be 32 respirations per minute. (Exh. I at NNMC 17).

27. A blood test taken in the emergency room showed high counts of white blood cells and neutrophyls, and a low count of lymphocytes. (Exh. I at NNMC 04).

28. Laboratory studies taken in the emergency room showed low sodium, low carbon dioxide, low alkaline phosphatase, high total bilirubin, and low osmolality. (Exh. I at NNMC 05).

29. In the emergency room Eric was started on a 500 mg. dose of Ceftizoxime administered by IV. (Exh. I at NNMC 01).

30. In the emergency room, the antibiotic Flagyl was ordered (250 mg. by IV), but there is no documentation of the ordered Flagyl having been administered. (Exh. I at NNMC 01).

31. Eric Dan received 2 mg. of morphine sulfate in the emergency room at 1:15 p.m. (Exh. I at NNMC 01).

32. Dr. Karen Fogelberg, a surgeon, examined Eric Dan after his arrival at NNMC. (Exh. I at NNMC 13-14).

33. Dr. Fogelberg's examination revealed that Eric was tachycardic and had labored, rapid breathing. (Exh. I at NNMC 13).

34. Her examination also determined that he had a diffusely tender abdomen and her examination was limited secondary to pain. (Exh. I at NNMC 13).

35. At the time of her examination, Eric's vital signs were reported to be: Temperature: 102°;

Pulse: 147; and Blood Pressure: 128/80. (Exh. I at NNMC 13).

36. Dr. Fogelberg's suspected that Eric had perforated appendicitis with a small bowel obstruction. (Exh. I at NNMC 14).

37. Based on this impression, her plan was to proceed to the operating room to perform an appendectomy. (Exh. I at NNMC 14).

38. A pre-operative assessment plan was developed and an evaluation written at 12:10 p.m. (Exh. I at NNMC 18).

39. Pre-operatively, at 1:10 p.m., Eric's vital signs were reported to be: Pulse: 147; Blood Pressure: 128/80; Respiration Rate: 24; Temperature: 102°. (Exh. I at NNMC 18).

40. Pre-operatively, at 1:10 p.m., Eric was reported to have a weight of 38 pounds and a height of 41 inches. (Exh. I at NNMC 18).

41. Pre-operatively, at 1:10 p.m., Eric had even, regular respirations, was alert and oriented, anxious, and had warm, dry, and pink skin. (Exh. I at NNMC 18).

42. The pre-anesthesia evaluation by Dr. Gordon Neufeld, the anesthesiologist, reported that Eric had an [American Society of Anesthesiology risk factor] rating of 4. (Exh. I at NNMC 21; Exh. 27 (Ponamon Deposition) at 11).

43. Dr. Neufeld started the anesthesia at 1:45 p.m. (Exh. I at NNMC 19).

44. The first surgical incision was made at 2:01 p.m. (Exh. I at NNMC 22).

45. According to Dr. Fogelberg: "On entering the abdomen, copious amounts of cloudy, foul smelling fluid drained from the wound onto the table." (Exh. I at NNMC 25; Exh. L (Fogelberg Deposition) at 62).

46. Eric's "entire peritoneal cavity was contaminated with this cloudy foul smelly fluid."

(Exh. I at NNMC 25).

47.     Dr. Fogelberg aspirated approximately 200 to 300 cc's of this fluid. (Exh. I at NNMC 25).

48.     Dr. Fogelberg also aspirated a "fairly significant volume of cloudy infected fluid" from the pelvis. (Exh. I at NNMC 25).

49.     In addition, "a small amount of cloudy fluid was aspirated" with a suction catheter from the right paracolic gutter. (Exh. I at NNMC 25).

50.     A specimen was removed from the appendix and sent to the laboratory. (Exh. I at NNMC 7, 25; Exh. L at 41-42). A culture of the sample showed E-coli and Bacteroides Fragilis. (Exh. I at NNMC 7; Exhibit L at 40-42).

51.     A blood culture taken by Dr. Laurie LeMauviel in the emergency room also showed Bacteroides Fragilis. (Exh. I at NNMC 8; Exhibit L at 42).

52.     The findings of Bacteroides Fragilis show that Eric "had significant infection. He had not only infection in his abdomen, but that it had spread to his bloodstream." (Exh. L at 42).

53.     Eric's appendicitis was "the worst" case Dr. Fogelberg had ever seen. "[T]he perforation itself, there might have been other perforations that were as bad, but the extent of peritoneal contamination with puss, his was the worst." (Exh. L at 138).

54.     Eric Dan developed septic shock due to his perforated appendix. (Exh. 28 (Ponamon Deposition) at 22; Exh. I at 60). The perforation allowed bacteria to cross initially into the abdominal cavity and then be taken up into the blood stream. This is how the infection was caused. (Exh. 27 at 22.).

55.     Dr. Fogelberg irrigated the abdomen repeatedly with an antibiotic containing saline.

(Exh. I at NNMC 25). Specifically, 2,000 cc. normal saline with tobramycin was used to irrigate Eric's abdominal wound. (Exh. I at NNMC 19; Exh. L at 62-63).

56. During surgery, Eric received the following: 150 mg. Fentanyl; 0.5 mg. Versed; 40 mg. Propofol; 20 mg. Succinylcholine; and 30 mg. Rocuronium. (Exh. I at NNMC 22).

57. Eric's wound was packed open. (Exh. I at NNMC 26).

58. Surgery was completed at 3:00 p.m. (Exh. I at NNMC 22).

59. According to Dr. Fogelberg, Eric "remained hemodynamicly [sic] stable throughout the case, but remained intubated on completion of the operation and was taken to the Intensive care unit in stable but *critical condition*." (Exh. I at NNMC 26) (emphasis added).

60. Ms. Kelley DeFeo, an expert for Plaintiffs, testified: "Septic shock is a complex series of interrelated events, which can eventually lead to death. It is the most common cause of death in the ICU and *is the second most common cause of death in pediatric patients.*" (Exh. 24 (DeFeo report served on March 6, 2002) at 7) (emphasis added).

61. Dr. Michael Ponamon, an expert for Plaintiffs, testified that septic shock can result in death and severe organ damage even if treated properly. (Exh. 27 at 22-23).

62. At the end of surgery, Eric was transferred to the care of Post Anesthesia Care Unit ("PACU") nurses in the Intensive Care Unit. (Exh. I at NNMC 57). His vital signs were: Pulse: 164; Blood Pressure: 116/90; Temperature: 98. No respiration rate was recorded. (Exh. I at NNMC 57).

63. Eric, who remained intubated, was admitted to the intensive care unit at 3:10 p.m.

64. Upon arrival in the intensive care unit, while intubated, Eric's vital signs were: Pulse:

175; Blood Pressure: 90/45; Respiration Rate: Bagged at 15; Temperature: 98°.

65. Eric was extubated at about 4:20 p.m. to 4:23 p.m. on the order of Dr. Fogelberg.

66. Dr. Fogelberg did not order arterial blood gases initially or a Swan-Ganz catheter because she felt that she was able to monitor Eric's hemodynamic status. (Exh. L at 156). If she thought that his respiratory status was in question or that he needed arterial blood gasses, she would have considered transferring Eric to UNMH. (Exh. L at 157).

67. While in the Intensive Care Unit, Eric received nursing care from Nurse Margaret "Peggy" Lemon, an employee of the United States, and Nurse Jocelyn Sanchez-Russell, a contractor employee. (Exh. J (Lemon Deposition); Exh. K (Sanchez-Russell Deposition)).

68. According to the NNMC Narcotic Log and NNMC medical records, Eric received 8 mg. of morphine sulfate for pain management while in the Intensive Care Unit. (Exh. G (NNMC Narcotics Log); Exh. I).

69. According to the NNMC Versed Log and NNMC medical records, Eric received 1.5 mg of Versed while in the Intensive Care Unit. (Exh. H (NNMC Versed Log); Exh. I).

70. At 5:00 p.m., Nurse Peggy Lemon gave Eric a 0.5 mg. dose of Versed. (Exh. I at NNMC 45; Exh. H).

71. At 6:20 p.m., Nurse Lemon gave Eric a 1.0 mg. dose of Versed. (Exh. I at NNMC 56; Exh. H).

72. Over the course of the evening, Dr. Fogelberg was regularly apprised of Eric Dan's condition through nursing reports and personal visits. (Exh. I; Exh. L; Exh. K; Exh. J).

73. Dr. Fogelberg was paged at 10:50 p.m., after Eric's respiration rate dropped to 8

respirations per minute.  (Ex. L;  Exh. K;  Exh. I).

74.   Dr. James Bochsler was also called to Eric's room where he assisted in bag mask valve
      ventilation with improvement of his oxygen saturation levels into the 80's and heart rate
      into the 150's and 160's.  (Exh. I at NNMC 60).  Dr. Fogelberg arrived in Eric's room
      shortly thereafter.  (Exh. I at NNMC 58).

75.   Dr. Boschler subsequently easily intubated Eric and he was placed on a ventilator.  (Exh.
      I at NNMC 60).

76.   In a transfer summary, Dr. Boschler wrote:  "Due to his worsening clinical status with
      respiratory failure, is thought to be secondary to his sepsis after perforated appendicitis,
      will be transferred to the University of New Mexico hospital under the care of Dr. Mark
      Crowley in the Pediatric Intensive Care Unit."  (Exh. I at NNMC 60).

77.   Eric was transferred by helicopter to University of New Mexico Hospital at 1:30 a.m. on
      July 22, 1998.  (Exh. I at NNMC 60-61; Exh. 14 (Air transport Record)).

78.   Eric received medical care at the University of New Mexico Hospital thereafter.

79.   Eric Dan has severe and global neurological abnormalities, including spastic
      quadriplegia, cognitive impairment, and visual impairment. (Exh. Q (Johnson Report);
      Exh. M (Johnson Deposition)).

80.   Eric Dan's disability and impairments are permanent.  (Exh. Q;  Exh. M).

81.   At all times relevant to the incident or events giving rise to Plaintiffs' Complaint, the
      United States and/or its employees possessed and applied the knowledge and used the
      skills and care ordinarily used by reasonably well-qualified hospitals, clinics, physicians,
      nurses, or other health care providers of the same type and specialty, giving due

-10-

consideration to the locality involved.

82. Plaintiffs failed to show by a preponderance of the evidence that employees of the United States caused Eric Dan's injuries.

## Damages Sought by Plaintiffs

83. On April 6, 1999, Plaintiffs filed an administrative claim with the Department of Health and Human Services alleging negligence in the care of Eric Dan. The administrative claim, as amended, seeks $20,000,000.00 in damages.

84. On January 5, 2001, Plaintiffs filed the present action in the Federal District Court for the District of New Mexico. Plaintiffs filed an amended complaint on July 19, 2001. The amended complaint seeks an unspecified amount of damages, alleging that the future care of Eric Dan will cost $12,000,000.00. Complt. at ¶ 48.

## Medical Expenses and Benefits

85. Most of the medical bills incurred by Eric Dan were paid for by Arizona Medicaid. (Exh. 90 (Medical Bills); Exh. N; Exh. O).

86. Arizona Medicaid paid a total of $14,585.73 for Eric Dan's care by University Physicians. (Exh. 90).

87. Arizona Medicaid paid a total of $30,468.20 for Eric Dan's care at Hacienda de Los Ninos in Phoenix, Arizona. (Exh. 90).

88. A total of $2,802 was paid for care received by Eric Dan at the Children's Health Center in Flagstaff, Arizona. (Exh. 90).

89. A total of $185,646.00 was charged for care received by Eric Dan at University of New Mexico Hospital. (Exhibit 90).

90. Eric Dan was seen by Dr. Jeffrey Grant at Manzano Medical in Farmington, New Mexico. The appointment was made by Plaintiffs' counsel. Dr. Grant was consulted for an evaluation to assist in the preparation of Plaintiffs' Life Care Plan. Dr. Grant's report was provided to Plaintiffs' Life Care planner, Dr. Gracey, and one of Plaintiffs' medical experts, Dr. Singer, to review in preparing their expert reports. The evaluation by Dr. Grant was completed for litigation purposes. (Testimony of Dr. Gracey; Testimony of Dr. Singer).

91. Eric Dan received Supplemental Security Income benefits as a result of his injuries. (Exh. P (Social Security Administration Records)).

### Expert Opinions

92. Plaintiffs' expert economist, Dr. Brian McDonald, is not qualified to provide an opinion as to loss of enjoyment of life and value of life. (Testimony of Dr. Brian McDonald).

93. Plaintiffs' proposed nursing experts, Kelly DeFeo and Dr. Suzette Cardin, are not qualified to give opinions on issues of causation in this case. (Testimony of Ms. Kelley DeFeo and Dr. Suzette Cardin; Exh. 24 (DeFeo Reports); Exh. 31 (Cardin Reports)). 93. Plaintiffs' life care planner, Dr. James Gracey, is not qualified to testify about Eric Dan's life expectancy. (Testimony of Dr. James Gracey).

94. Eric Dan does not have a normal life expectancy. (Exh. M (Johnson Deposition); Exh. Q (Johnson Report I); Exh. R (Johnson Report II)).

95. Eric Dan's life expectancy, from the point at which his condition stabilized about a year following his injury, is approximately 15 to 35 years. A more likely estimate is in the 15-year range. (Exh. R at 1).

96. Plaintiffs have not met their burden of proof in showing that Eric Dan requires licensed nursing care at home if he continues to receive regular routine medical care.

97. Eric Dan's caretaking needs can be met by his parents and the services of a certified nursing assistant. (Exh. A (Reavis Report I) at 25). In fact, due to the remoteness of the Eric Dans' current home, it has been difficult for them to find anyone to assist with Eric Dan's care. (Exh. A at 25; Exh. N at 23-24).

98. Plaintiffs have not met their burden of showing that Eric Dan needs 24-hour a day care prior to his 21st birthday.

99. Eric Dan does not require constant hands-on care. (Exh. B at 2).

100. Eric Dan's family members have been providing excellent care to Eric Dan and can continue to take care of him at home with respite provided from a home care attendant. (Exh. B at 3).

101. The life care plans prepared by the United States' expert, Sharon Reavis, reasonably assume that respite will be provided by a home care attendant 10 to 16 hours per day plus 24 hours per day for 2 days each month until Eric Dan is 21 years of age. It is assumed that Eric Dan will attend school or be cared for by his parents the remainder of the time. Up to the age of an adult, it would certainly be appropriate for the Dans to be involved with Eric Dan's care, and they are on a daily basis. Once Eric Dan is an adult, full time care by a home care attendant is assumed. (Exh. A; Exh. B at 2-3).

102. Assuming that the Dans remain at their current home on the reservation, the cost of providing care for Eric Dan at home is approximately $60,811 to $74,073 per year until Eric Dan is 21 years of age, and approximately $107,573 thereafter. (Exh. A). The

present value of caring for Eric Dan at the Dans' current home is $728,704 to $887,630 given Eric's estimated life expectancy of fifteen years from the point at which his condition stabilized. (Exh. E (Rhodes Report)).

103. Assuming that the Dans move to Albuquerque, New Mexico, the cost of providing care for Eric Dan at home is approximately $71,308 to $86,860 per year until Eric is 21 years of age, and approximately $126,144 thereafter. (Exh. A). The present value of caring for Eric Dan at home in Albuquerque is $854,507 to $1,040,869 given Eric Dan's estimated life expectancy. (Exh. E).

104. Assuming that the Dans remain at their current home on the reservation, the present value of a reasonable life care plan to meet Eric Dan's future medical needs is approximately $984,273 to $1,143,198 given Eric Dan's estimated life expectancy of fifteen years from the point at which his condition stabilized. (Exh. E).

105. Assuming that the Dans move to Albuquerque, New Mexico, the present value of a life care plan to meet Eric Dan's future medical needs is approximately $1,094,669 to $1,281,032 given Eric's estimated life expectancy of fifteen years from the point at which his condition stabilized. (Exh. E.)

106. The traditional ceremonies for which Plaintiffs' seek compensation do not constitute actual medical care. (Testimony of Sharon Reavis; Exh. B at 2).

107. Eric Dan is eligible for "free educational services" under federal and Arizona state law. (Exh. DD (Eric Dan's Educational Records); Exh. N).

108. Currently, Red Mesa School District is providing Eric Dan one hour of physical therapy and one hour of occupational therapy per day. (Exh. A; Exh. N).

109. The economist report prepared by the United States' expert, Dr. George Rhodes, provides reasonable estimates of Eric Dan's loss of earning capacity, stated in terms of present value. Assuming that Eric Dan would have earned a high school degree, the present value of his lost earning capacity is $759,608. If reductions are allowed for taxes and personal maintenance after death, the present value of Eric Dan's lost earning capacity is $167,751 given his estimated life expectancy. (Exh. E.)

110. It is in Eric Dan's best interest to place any award of damages for future medical care in a trust in which the United States has a reversionary interest.

### Comparative Negligence

111. Eric Dan's injuries, while unfortunate, were caused in part by Eric Dan's delayed presentation for medical treatment by his parents, Ernest and Elsie Dan, and medical complications for which the United States is not responsible. Eric Dan presented to NNMC with septic shock resulting from a perforated appendix. Eric Dan's injuries are a result of his septic shock. (Exh. I).

112. To the extent there was any negligence on the part of the staff of NNMC, Nurse Russell was the negligent party. (Exh. K (Sanchez-Russell Deposition); Exh. L (Fogelberg Deposition)).

### B. CONCLUSIONS OF LAW

1. The United States, as sovereign, is "immune from suit save as it consents to be sued . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." United States v. Dalm, 494 U.S. 596, 608 (1990); see also Weaver v. United States, 98 F.3d 518, 20 (10th Cir. 1996).

2.      The United States consented to a limited waiver of sovereign immunity in the Federal

        Tort Claims Act ("FTCA"). 28 U.S.C. §§ 1346(b), 2671 et seq.; United States v. Orleans,

        425 U.S. 807, 813 (1976). The terms of the United States' limited waiver of sovereign

        immunity establish the parameters of a court's subject matter jurisdiction to hear FTCA

        cases. See Weaver, 98 F.3d at 520.

3.      As a condition of its waiver of sovereign immunity, the United States can be held liable

        only for the "negligent or wrongful act or omission of any employee of the Government

        while acting within the scope of his office or employment under circumstances where the

        United States, if a private person, would be liable to the claimant in accordance with the

        law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

4.      Because the alleged acts or omissions in this case occurred in New Mexico, New Mexico

        law governs this action. See 28 U.S.C. § 1346(b); Federal Express Corp. et al. v. United

        States, CIV 01-227 WJ/DJS-ACE (D.N.M. Sept. 17, 2002); Miguel v. United States, No.

        CIV 99-1574 PHX VAM (D. Ariz. June 14, 2002); Bryant v. United States, 147

        F.Supp.2d 953 (D. Ariz. 2000).

5.      Under New Mexico law, in a medical malpractice case, the plaintiff must show that: (1)

        the defendant owed the plaintiff a duty recognized by law; (2) the defendant breached the

        duty by departing from the proper standard of medical practice recognized in the

        community; and (3) the acts or omissions complained of proximately caused the

        plaintiff's injuries. See Blauwkamp v. University of New Mexico Hospital, 836 P.2d

        1249, 1252 (N.M. 1992).

6.      A proximate cause of an injury is that which, in a natural and continuous sequence

unbroken by an independent intervening cause, produces the injury and without which the injury would not have occurred. Plaintiffs must show by a preponderance of the evidence that Defendant United States' negligence resulted in Eric Dan's injuries. See Chamberland v. Roswell Osteopathic Clinic, Inc., 130 N.M. 532, 535 (N.M. Ct. App. 2001) (citing UJI 13-305).

7.     The standard for establishing causation in New Mexico is proof to a reasonable degree of medical probability. See Alberts v. Schultz, 126 N.M. 807 (N.M. Ct. App. 1999) (citing Lopez v. Southwest Community Health Services, 114 N.M. 2, 6-7 (N.M. Ct. App. 1992); Schrib v. Seidenberg, 80 N.M. 573, 575 (N.M. Ct. App. 1969)).

8.     Plaintiffs have failed to establish, by a preponderance of the evidence, that the care provided by Defendant United States breached the applicable standards of care.

9.     Plaintiffs have failed to establish, to a reasonable degree of medical probability, that any of the alleged breaches in the applicable standard of care proximately caused Eric Dan's injuries.

### Expert Witnesses

10.     In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the Supreme Court determined the standard for admitting expert testimony in a federal case. In response to Daubert and subsequent cases applying it, Rule 702 of the Federal Rules of Evidence, which governs expert testimony, was amended to provide:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

See Fed. R. Evid. 702.

11.     Pursuant to Federal Rule of Evidence 702, <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, and <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137 (1999),  Plaintiffs' economic expert, Dr. Brian McDonald is not qualified to testify as to loss of enjoyment of life and the value of life.

12.     Pursuant to Federal Rule of Evidence 702, <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, and <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137 (1999), Plaintiffs' proposed nursing experts, Kelly DeFeo and Dr. Suzette Cardin, are not qualified to give opinions on issues of causation in this case.

13.     Pursuant to Federal Rule of Evidence 702, <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, and <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137 (1999), Plaintiffs' life care planner, Dr. James Gracey, is not qualified to testify about Eric Dan's life expectancy.

### Damages Allowable in the Event the United States is Found Negligent

14.     Any award of damages is limited to the amount sought by Plaintiffs' administratively.  28 U.S.C. § 2675(a).

15.     The United States has not waived sovereign immunity for the award of punitive damages, and therefore punitive damages may not be awarded in this case.  <u>See</u> 28 U.S.C. § 2674.

16.     Under the FTCA, no separate award can be made for attorneys' fees.  <u>See</u> <u>Anderson v. United States</u>, 127 F.3d 1190, 1191-92 (9th Cir. 1997); <u>Joe v. United States</u>, 772 F.2d 1535, 1536-37 (11th Cir. 1985).

17.     Under New Mexico law, successful plaintiffs in medical malpractice cases can recover damages for pain and suffering, loss of enjoyment of life, lost wages, and medical

expenses. See Collins v. Perrine, 108 N.M. 714 (N.M. Ct. App. 1989).

18.     The provisions of the New Mexico Medical Malpractice Act ("NMMMA"), N.M. Stat.

Ann. §§ 41-5-1 et seq., apply to the United States either directly or as a private party

equivalent. See Carter v. United States, 982 F.2d 1141 (7th Cir. 1992); Lozada v. United

States, 974 F.2d 986 (8th Cir. 1992); Starns v. United States, 923 F.2d 34 (4th Cir. 1991);

Owens v. United States, 935 F.2d 734 (5th Cir. 1991); Taylor v. United States, 821 F.2d

1428 (9th Cir. 1987); Lucas v. United States, 807 F.2d 414 (5th Cir. 1986).

19.     The NMMMA limits the amount of damages recoverable in New Mexico medical

malpractice actions as follow:

> Except for punitive damages and medical care and related benefits,
> the aggregate dollar amount recoverable by all persons for or
> arising from any injury or death to a patient as a result of
> malpractice shall not exceed six hundred thousand dollars
> ($600,000) per occurrence.

N.M. Stat. Ann. § 41-5-6(A) (emphasis added). The value of accrued medical care and

benefits does not fall within this cap. N.M. Stat. Ann. § 41-5-6(B).

20.     By its terms, this $600,000 cap on non-medical damages recoverable by all persons

applies to the actions of all of the health care professionals in this case, including the

nursing staff at NNMC. See N.M. Stat. Ann. § 41-5-6(A).

21.     Even if the cap's applicability is limited to "health care providers" as defined in the

NMMMA, the United States is a health care provider under the terms of that statute. See

N.M. Stat. Ann. § 41-5-3(A); Bryant v. United States, 126 F. Supp.2d 1227, 1234 (D.

Ariz. 2000).

22.     The limitation on damages contained in the NMMMA is constitutional. See Federal

Express Corp., et al. v. United States, CIV 01-227 WJ/DJS-ACE (D.N.M. Sept. 17, 2002); Trujilo v. City of Albuquerque, et al., 125 N.M. 721 (1998); Cummings v. X-Ray Assoc. of N.M., P.C., 121 N.M. 821 (1996).

23.    The NMMMA further provides that "[m]onetary damages shall not be awarded for future medical expenses in malpractice claims." N.M. Stat. Ann. § 41-5-6(C). Rather, the fact finder determines whether the injured person is entitled to future medical care and related benefits. N.M. Stat. Ann. § 41-5-7(A). Then, payment for medical care and related benefits is made "as expenses are incurred," N.M. Stat. Ann. § 41-5-7(D), with the state district court maintaining continuing jurisdiction to determine the extent of the patient's need. N.M. Stat. Ann. § 41-5-9 (A), (B). Payments for future medical care continue only as long as "medical or surgical attention is reasonably necessary." N.M. Stat. Ann. § 41-5-7(B).

24.    Federal courts, however, cannot subject the United States to such ongoing obligations under the FTCA. See Hull v. United States, 971 F.2d 1499, 1505 (10th Cir. 1992), cert. denied, 507 U.S. 1030 (1993) (citing Frankel v. Heym, 466 F.2d 1226, 1228-29 (3d Cir. 1972)). The rationale behind this rule is two-fold: (1) the FTCA's waiver of sovereign immunity incorporates the common law principle that awards must take the form of common law money judgments, and (2) lump-sum judgments are preferable to judgments that would impose a continuing burden on the federal judiciary. See Hull, 971 F.2d at 1504.

25.    In order to best approximate the results of the NMMMA in a case involving the United States, therefore, any award for future medical costs shall be placed in a trust in which the

United States has a reversionary interest. See <u>Hill v. United States</u>, 81 F.3d 118 (10th Cir. 1996). In addition, the creation of such a reversionary trust is in the best interest of Eric Dan. See <u>Hull v. United States</u>, 971 F.2d 1499 (10th Cir. 1992).

## Comparative Negligence

26. The state of New Mexico follows a pure comparative negligence model which apportions fault between the plaintiff and the defendant. See <u>Torres v. El Paso Electric Company</u>, 987 P.2d 386 (N.M. 1999) (citing <u>Scott v. Rizzo</u>, 635 P.2d 1234, 1235 (N.M. 1981)); <u>see also</u> N.M. Stat. Ann. § 13-918 (Michie 1978).

27. Under New Mexico law, "the trial court must permit the jury to determine the percentage of negligence, if any, on the part of each alleged tortfeasor <u>whether or not they are a party in the case . . . .</u>" <u>Sena v. New Mexico State Police</u>, 119 N.M. 471, 474 (N.M. Ct. App. 1995) (citing <u>Bartlett v. New Mexico Welding Supply, Inc.</u>, 98 N.M. 152, 159, (N.M. Ct. App. 1982)) (emphasis added); <u>Jaramilo v. Kellog</u>, 126 N.M. 84, 85 (N.M. Ct. App. 1998).

28. Any recovery by Plaintiffs must be reduced by the Dan's contributory negligence in failing to bring Eric Dan to the emergency room earlier.

29. Any recovery by Plaintiffs must be reduced by the amount of negligence attributed to Nurse Russell.

## Other Limits on Plaintiffs' Potential Recovery

30. Any award of damages for past medical expenses is limited to the amount actually paid for the medical services provided. See <u>Wildermuth v. Staton</u>, 2002 WL 922137 (D. Kan. April 29, 2002); <u>Strahley v. Mercy Health Center of Manhattan</u>, 2000 WL 1745291

(D.Kan. 2000); <u>Davis v. Management & Training Corp. Centers</u>, 2001 WL 709380

(D.Kan. 2001); <u>Chapman v. Mazda Motor of America, Inc.</u>, 7 F. Supp.2d 1123 (D. Mont.

1998); <u>Moorhead v. Crozer Chester Medical Center</u>, 765 A.2d 786 (Sup. Ct. PA 2001);

<u>Hanif v. Housing Authority of Yolo Co.</u>, 200 Cal. App.3d 635 (1988); <u>Terrell v. Nanda,

M.D., et al.</u>, 759 So.2d 1026 (La.App. 2 Cir. 2000); <u>Bates v. Hogg</u>, 921 P.2d 249

(Kan.App. 2 1996).

31.    Plaintiffs may not recover the cost of Eric Dan's evaluation by Dr. Jeffrey Grant as part of

any award for past medical expenses.  This examination was conducted for the purposes

of litigation.  As such, these charges were not necessary as a result of Eric Dan's injury

and are not recoverable as an aspect of damages.  Should a judgment be rendered in

Plaintiffs' favor, Plaintiffs' may seek to recover this expense in any award of costs.  <u>See</u>

28 U.S.C. § 1920.

32.    Under New Mexico law, "[c]ompensation received from a collateral source does not

operate to reduce damages recoverable from a wrongdoer."  <u>Trujillo v. Chavez</u>, 76 N.M.

703, 708 (1966).  This rule, however, does not apply if the benefits are shown to come

from the defendant or a source identified with the defendant.  <u>See</u> <u>Yardman v. San Juan

Downs</u>, 120 N.M. 751, 753 (Ct. App. 1995) (citing <u>Aragon v. Brown</u>, 93 N.M. 646, 648

(Ct. App. 1979), overruled on other grounds in <u>Smith v. Village of Ruidoso</u>, 128 N.M.

470 (N.M. App. 1999)).  Thus, in a case, such as this one, in which the United States is

the Defendant, any benefits paid with funds from general government revenues are not

considered collateral and are therefore properly the subject of an offset.  <u>See</u> <u>Mays v.

United States</u>, 806 F2d 976, 977 (10th Cir. 1986).

33.	Supplemental Security Income benefits are paid from the general treasury. See 42 U.S.C. § 1381 (authorizing annual appropriations to fund the program). As a result, any award of damages must be offset by the value of Supplemental Security Income benefits received by Eric Dan. See Mays v. United States, 806 F.2d 976 (10th Cir. 1986); Berg v. United States, 806 F.2d 978 (10th Cir. 1986); Steckler v. United States, 549 F.2d 1372 (10th Cir. 1977).

34.	Any award of future benefits should be reduced to present value. See Diversey Corp. v. Chem-Source Corp., 965 P.2d 332, 342 (N.M. Ct. App. 1998) (quoting State ex rel. Martinez v. Lewis, 116 N.M. 194, 209 (Ct. App. 1993) for the proposition that future damages must be discounted to present value.); see also Steckler v. United States, 549 F.2d 1372, 1378 (10th Cir. 1977) (finding that an award of lost future income should be reduced to present value in a FTCA case).

35.	Pursuant to 42 U.S.C. § 1396a(a)(25), state agencies administering Medicaid programs are required to "take all reasonable measures to ascertain the legal liability of third parties" to pay for medical services provided by Medicaid and seek reimbursement for medical assistance provided by the state to the extent of such liability. Pursuant to Arizona law, the Arizona Health Care Cost Containment System Administration ("AHCCCSA") is thus entitled to a lien on any recovery by Plaintiffs in the amount paid by AHCCCSA for Eric Dan's medical care. See A.R.S. § 36-2915 (A).

36.	The Individuals with Disabilities in Education Act requires state education agencies that receive federal funds to monitor the provision of education in the state and to ensure an adequate education for all children, including those with disabilities. 20 U.S.C. §§ 1400,

et seq. Specifically, participating state education agencies are required to provide a "free appropriate public education" to all students, including those who are disabled. See 20 U.S.C. § 1412. The State of Arizona implements the IDEA through its Department of Education. See Doe v. Arizona Board of Education, 111 F.3d 678, 680 (9th Cir. 1997).

37. The Court therefore takes judicial notice, pursuant to Federal Rule of Evidence 201, of the fact that the State of Arizona is required by law to provide a "free appropriate public

/ / /

/ / /

/ / /

education" to Eric Dan. This requirement includes the provision of services such as physical and occupational therapy. See 20 U.S.C. § 1412 (setting out the obligation of state education agencies receiving Federal funding to provide children with disabilities a "free appropriate public education"); 20 U.S.C. § 1401(8) (defining a "free appropriate public education" to include "related services"); 20 U.S.C. § 1401 (22) (defining "related services" to include physical and occupational therapy).

Dated: October 21, 2002

Respectfully Submitted,

ROBERT D. McCALLUM
Assistant Attorney General
Civil Division

DAVID C. IGLESIAS
United States Attorney
District of New Mexico

PHYLLIS A. DOW
Assistant United States Attorney
District of New Mexico

GAIL K. JOHNSON
Trial Attorney
Torts Branch, Civil Division

TRACEY A. HARDIN
Trial Attorney
Torts Branch, Civil Division
U.S. Department of Justice
P.O. Box 888
Benjamin Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-4294
Facsimile: (202) 616-5200

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **Defendant United States'**

**Proposed Findings of Fact and Conclusions of Law**, were served on October 21, 2002, by U.S.

mail, on the following counsel of record:

Mr. Scott Borg
Ms. Susan Herrera Widner
Rosenfelt, Barlow, & Borg, P.A.
1805 Carlisle Boulevard, N.E.
Albuquerque, NM 87110

Phyllis A. Dow
Assistant U.S. Attorney